**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RAYMOND PESSO, Dr.,
Plaintiff-Appellant,

v.

No. 98-1978

MONTGOMERY GENERAL HOSPITAL;
MICHELLE STEPHENS,
Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
Elizabeth V. Hallanan, Senior District Judge.
(CA-97-718-5)

Argued: April 8, 1999

Decided: May 24, 1999

Before WILKINSON, Chief Judge, and
NIEMEYER and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Daniel Lennon Saxe, SAADY & SAXE, Tampa, Florida,
for Appellant. Joseph Michael Farrell, Jr., FARRELL, FARRELL &
FARRELL, Huntington, West Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Raymond Pesso claims that while serving as the director of anesthesiology at Montgomery General Hospital, he was sexually harassed by a Hospital vice president, Michelle Stephens. Finding no merit in his various contentions, we affirm the judgment of the district court.

I.

Raymond Pesso was employed as director of anesthesiology at Montgomery General Hospital. Pesso worked at the Hospital from July 1994 until he resigned in November 1996 to take a position in his native New York.

Pesso alleges that the Hospital's vice president of patient care, Michelle Stephens, was "mesmerized" by him and made comments which he claims were inappropriate. Specifically, he alleges that in September 1994 Stephens told him that he appeared "handsome" before a meeting. Six months later, Pesso and Stephens attended a conference in Charleston. Pesso claims that she suggested that the two should get a hotel room together. In July 1995, Pesso returned from a trip to Mexico and Stephens allegedly told him that he "should be in GQ Magazine with that tan." Pesso also alleges that in December of that year, Stephens saw him at a Christmas party and began "wiggling" in an excited manner. Soon after the party, she presented him with his bonus check, shook his hand, rubbed his upper arm, and told him that he "looked as good as ever."

Pesso further claims that in a June 1996 conversation, Stephens made a number of objectionable statements. These included "Were you always this handsome?"; "Were you always popular with the girls?"; and "What sports did you play in high school?" During the

2

conversation, Pesso alleges that Stephens grabbed his arm and mentioned that he was muscular. In an effort to change the subject, Pesso told Stephens that if she was serious about diet and exercise he would put together a diet for her if she wanted. At no time prior to or during this meeting, however, did he ever tell Stephens that her comments were unwelcome.

After this conversation, Pesso alleges that Stephens telephoned him. He asked if she wished to talk about her diet. In response, Stephens allegedly stated that she was wondering what he would "taste like." Pesso responded that her comment was inappropriate and ended the conversation.

After resigning from the Hospital, Pesso filed suit against it and Stephens. He alleged that he was constructively discharged because of intolerable sexual harassment by Stephens. Specifically, he brought Title VII claims of hostile work environment harassment, quid pro quo harassment, and retaliation, as well as various state law claims.

In June 1998, the district court granted summary judgment for the defendants. It held that a hostile work environment did not exist because Stephens' comments were not sufficiently severe or pervasive. And the court found no quid pro quo harassment because Pesso failed to show that reaction to Stephens' comments led to a change in the terms and conditions of his employment. Nor did the court find merit in Pesso's claim that the Hospital illegally retaliated against him. It held that Pesso never engaged in protected activity, and in any event he did not demonstrate any legally cognizable adverse action taken by the Hospital against him. Further, the court concluded that in the absence of intolerable working conditions, a claim for constructive discharge could not lie. After dismissing all of Pesso's federal claims, the court declined to exercise supplemental jurisdiction over his state law claims. Pesso appeals.

II.

Pesso first argues that the district court erred by dismissing his claim for the creation of a sexually hostile environment. Title VII bars discrimination in the terms and conditions of employment on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Although "not all workplace con-

3

duct that may be described as `harassment' affects a `term, condition, or privilege' of employment within the meaning of Title VII," a supervisor's "severe or pervasive" conduct may alter those terms and conditions. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986).

Pesso contends that Stephens, his supervisor, made comments which were severe and pervasive and thus created a hostile working environment. We disagree. Whether conduct is severe or pervasive requires an examination of all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The Supreme Court has noted the importance of the severe or pervasive requirement: It "ensure[s] that courts and juries do not mistake ordinary socializing in the workplace -- such as male-on-male horseplay or intersexual flirtation -- for discriminatory`conditions of employment.'" Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1003 (1998).

Here, the evidence simply does not show a sexually hostile working environment. Most of Pesso's allegations amount to innocuous interactions. And those which were more serious-- asking if he wanted to get a hotel room at a medical conference and wondering aloud what Pesso would "taste like" -- were neither severe nor pervasive. After both comments were made, Pesso was able to quickly put an end to such talk by simply ignoring the comment or telling Stephens that she was behaving inappropriately. Additionally, the two comments were made approximately eighteen months apart. We cannot conclude that these comments subjected Pesso to sexually hostile working conditions which altered the terms and conditions of his employment.[1]

_____

[1] For the same reasons, we hold that Pesso was not exposed to the type of intolerable working conditions that are required to maintain a claim of constructive discharge. See Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1132-33 (4th Cir. 1995).

III.

Pesso also appeals the dismissal of his claim for quid pro quo sexual harassment. As an initial step in a quid pro quo case, a plaintiff must demonstrate that he was subject to unwelcome sexual harassment based upon sex and the "employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment." Spencer v. General Elec. Co., 894 F.2d 651, 658 (4th Cir. 1990), overruled on other grounds by Farrar v. Hobby, 506 U.S. 103 (1992).

Pesso argues that he introduced evidence showing that his rebuffing of Stephens' harassment led to the alteration of the terms and conditions of his employment. Specifically, he notes that after he told Stephens her comment was inappropriate, she began complaining about the costs of his pain clinic, his call schedule was altered, and the Hospital delayed in giving him a letter of intent to renew his contract.

While evidence in the record did show that Stephens was concerned about the costs of the pain clinic which was run by Pesso, those comments were made in the context of an overall managerial effort to trim costs and end a string of unprofitable years at the Hospital. In any event, managerial complaints about profitability do not change the terms and conditions of employment. This is so even when, as Pesso contends, he became so upset by the complaints that he offered to take a pay cut.

Nor did the evidence show that Pesso's call schedule was altered. Pesso complains that an employee in the pain clinic, Giles Bowman, was fired in order to make it more difficult for Pesso to do his work. Specifically, he alleges that following Bowman's termination, his call schedule was increased, placing him on call every other day instead of the one in three days mandated by his employment contract. This contention, however, lacks support in the record. In fact, it is directly contradicted by the testimony of the operating room supervisor who swore that following Bowman's departure, Pesso was scheduled to be on call only eleven days per month during August, September, and October of 1996. And in November, he was scheduled for just six days. In light of Pesso's contractual commitment to be assigned to

5

"on-call rotations averaging one in three nights," Pesso adduced no evidence that his call schedule was affected.

Lastly, Pesso complains that in July 1996, he requested a letter of intent to renew his employment contract which was set to expire one year later. He alleges that the Hospital's vice president of physician services told him that he would need to confirm the renewal with Stephens. Pesso then heard nothing about the matter until he announced his resignation in September. This two month delay with respect to an employment contract that was not set to expire for another year in no way altered the conditions of Pesso's employment. Despite Pesso's numerous allegations, the terms and conditions of his employment remained unaffected by the actions of Stephens and other members of management at the Hospital.[2]

IV.

For the foregoing reasons, the judgment of the district court is hereby

AFFIRMED.[3]

_____

[2] Nor do these alleged harms rise to the level of adverse employment actions for the establishment of Title VII retaliation, 42 U.S.C. 2000e-3(a). See Munday v. Waste Management of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997), cert. denied, 118 S. Ct. 1053 (1998).

[3] Having affirmed the dismissal of all federal claims, we hold that the district court did not abuse its discretion by refusing to exercise supplemental jurisdiction over Pesso's state law claims. 28 U.S.C. § 1367(c)(3); Jordahl v. Democratic Party of Va., 122 F.3d 192, 203 (4th Cir. 1997), cert. denied, 118 S. Ct. 856 (1998); see also United Mine Workers v. Gibbs, 383 U.S. 715, 725-27 (1966).